UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

ARTHUR BOGORAZ,
                            Defendant.

**ORDER**

22 Cr. 19 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this no-fault insurance fraud case, Defendant Arthur Bogoraz moves for a "reasonable adjournment" of the trial date currently scheduled for January 17, 2024 (Dkt. No. 310) and also requests relief pursuant to Brady v. Maryland, 373 U.S. 83 (1963). (Bogoraz Br. (Dkt. No. 312) at 18-21)[1] For the reasons stated below, both requests will be denied.

## BACKGROUND

### I.   THE INITIAL INDICTMENT

The initial indictment in this case was filed on January 11, 2022 – nearly two years ago. (Dkt. No. 1) The indictment charges Bogoraz with participating in a long-running no-fault insurance fraud scheme that involved using medical clinics (the "No-Fault Facilities") fraudulently controlled by Bogoraz's co-conspirators to bill insurance companies for unnecessary medical procedures. (Id. ¶¶ 1-2) The Government alleges that Bogoraz and his co-conspirators promoted the fraudulent scheme by paying "hundreds of thousands of dollars" in bribes to "911 operators, hospital employees, and others . . . for confidential motor vehicle accident victim

---

[1] The page numbers of documents referenced in this order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

information" that was used to contact those accident victims and induce them to seek treatment at medical clinics controlled by the Defendants. (Id. ¶ 3)

The initial indictment (the "Indictment") is a twenty-page "speaking indictment" that describes the alleged no-fault insurance fraud scheme in great detail. The Government's allegations make clear that bribery and related money laundering were central to the alleged fraud scheme.

The Government provides an "overview" of the alleged illegal scheme at the outset of the Indictment:

> 1. For at least in or about 2008 up to and including in or about 2021, BRADLEY PIERRE, MARVIN MOY, WILLIAM WEINER, ANDREW PRIME, and ARTHUR BOGORAZ (the "Pierre Conspirators" or the "Conspirators"), the defendants, and others known and unknown, participated in a criminal scheme to exploit insurance programs designed to protect motor vehicle accident victims (the 'No-Fault Scheme')."
>
> 2. As part of the No-Fault Scheme, the Pierre Conspirators fraudulently owned and controlled five medical professional corporations – including clinics and an MRI facility – by paying licensed medical professionals to use their licenses to incorporate the professional corporations (collectively, the "No-Fault Facilities" or the "Facilities"). The Pierre Conspirators further defrauded automobile insurance companies by billing insurance companies for unnecessary and excessive medical treatments, falsifying clinical findings of injuries in MRIs, and lying under oath to insurance company representatives.
>
> 3. The Pierre Conspirators promoted the scheme through bribery. The Pierre Conspirators paid hundreds of thousands of dollars to co-conspirators (the "Runners"), who used this money [to] pay bribes to 911 operators, hospital employees, and others (collectively, the "lead sources") for confidential motor vehicle accident victim information. The Runners then used this information to contact automobile accident victims, lie to them, and induce them to seek medical treatment at, among other places, the No-Fault Facilities.
>
> 4. The Pierre Conspirators laundered the proceeds of the fraud through phony lending agreements, check-cashing entities, and shell companies. All told, the Pierre Conspirators billed insurance companies for more than $70 million in fraudulent medical treatments.

(Indictment (Dkt. No. 1) ¶¶ 1-4) (emphasis in original)[2]

After explaining the regulatory scheme for no-fault automobile insurance in New York – including the requirement that any medical clinic seeking reimbursement under the no-fault insurance law be "incorporated, owned, operated, and/or controlled by a licensed medical practitioner" (id. ¶¶ 5-6) – the Government explains the role of each named "Pierre Conspirator."

As to Bradley Pierre, the Government alleges that although he is not a licensed medical practitioner, he

> owned, operated, and controlled the No-Fault Facilities that engaged in the fraudulent billing for unnecessary and excessive medical treatment under the No-Fault Law, and falsified findings of clinical injury in MRIs. PIERRE engaged in multiple types of money laundering to conceal the proceeds of the No-Fault Scheme and financed a widespread bribery and kickback scheme to bring patients into the facilities.

(Id. ¶ 7) (emphasis in original).

The Indictment goes on to allege that Defendants Marvin Moy and William Weiner are corrupt physicians who participated in the fraud scheme by fraudulently incorporating the no-fault clinics in their name; by "conduct[ing] unnecessary and excessive medical treatments"; and by "falsify[ing] clinical findings of injury in MRI reports that were submitted to insurance companies." (Id. ¶ 8)

After identifying "Personal Injury Attorneys" as another category of conspirators participating in the fraudulent scheme, the Indictment sets forth the following description of Defendant Bogoraz's role in the scheme:

> ARTHUR BOGORAZ, the defendant, is a paralegal and manager at a New York-based personal injury law firm ("Law Firm-1"). BOGORAZ is not an attorney. However, BOGORAZ engaged in a quid pro quo whereby BRADLEY PIERRE,

---

[2] While Bogoraz is identified as a conspirator for purposes of the healthcare fraud conspiracy charged in Count One (see id. ¶ 1), his name is not included in the statutory allegation at the close of that count. (See id. ¶¶ 27-28)

3

the defendant, sent patients from the No-Fault Facilities to Law Firm-1 for legal representation in return for BOGORAZ referring clients to the No-Fault Facilities for medical treatment. In addition, BOGORAZ and PIERRE agreed to jointly pay bribes for patient and client referrals to the No-Fault Facilities and Law Firm-1.

(Id. ¶ 9)

Finally, the Indictment discusses the role of "Runners" – the individuals who paid

bribes to employees or agents of hospitals, medical service providers, police officers and 911 operators employed by the New York Police Department ("NYPD"), and other entities (collectively, the "lead sources"). These lead sources in turn unlawfully disclosed the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere. After obtaining the confidential information of motor vehicle accident victims – which often included victims' names, contact information, and medical information – the Runners contacted the victims and made false representations to steer the victims to receive medical treatment or legal representation at the No-Fault Facilities, Law Firm-1, and other medical clinics and attorney's offices. ANDREW PRIME, the defendant, is a Runner [who] bribed 911 operators and operated a call center as part of the scheme.

(Id. ¶ 10)

The Indictment also explains the central role that money laundering played in the alleged fraudulent scheme:

<u>Money Laundering</u>

20. The Pierre Conspirators laundered the proceeds of the No-Fault Scheme described above to conceal the operation. In order to conceal his receipt of the No-Fault Scheme proceeds, BRADLEY PIERRE, the defendant, caused the No-Fault Facilities to transfer the proceeds from the scheme to Medical Reimbursement Consultants ("MRC"), a company he controlled. The payments were falsely described a loan repayments.

21. As part of these phony financing arrangements, BRADLEY PIERRE, the defendant, purportedly gave loans to MARVIN MOY and WILLIAM WEINER, the defendants, in return for a percentage of any money later paid by insurance companies. In reality, MOY and WEINER paid PIERRE in excess of $10 million of what PIERRE was entitled to receive under the phony agreements.

22. BRADLEY PIERRE, the defendant, further concealed payments from the No-Fault Facilities to MRC by using check cashers, transferring funds to shell

4

> companies under his control, and arranging for funds to be paid to a family member ("Sibling-1").

(Id. ¶¶ 20-22)

Finally, the Indictment explains in detail the central role that bribery played in the alleged fraudulent scheme, including Defendant Bogoraz's bribery-related activities:

Bribery

> 23. The No-Fault Scheme depended on the No-Fault Facilities receiving a steady supply of motor vehicle accident victims.
>
> 24. As part of the scheme, BRADLEY PIERRE and ARTHUR BOGORAZ, the defendants, arranged for the Runners, including ANDREW PRIME, the defendant, to bribe employees or agents of public and private institutions, including hospitals and the NYPD, to unlawfully disclose the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere.
>
> 25. After obtaining the confidential information of motor vehicle accident victims, the Runners contacted the victims and made false representations in order to steer victims to receive medical treatment from the No-Fault Facilities, and legal representation from Law Firm-1 and Law Firm-2.
>
> 26. BRADLEY PIERRE, the defendant, paid the Runners approximately $1,500 to $3,000 per successful "referral" to a No-Fault Clinic, $700 to $1,500 per successful "referral to Law Firm-2, and $150 per successful "referral to Nexray. ARTHUR BOGORAZ, the defendant, likewise paid the Runners $700 to $1,500 per successful referral to Law Firm-1.  The Runners then took a portion of the kickbacks for themselves and funneled the rest of the money to the lead sources that provided the confidential information.

(Id. ¶¶ 23-26) (emphasis in original)

The Indictment charges (1) Bradley Pierre, Moy, and Weiner with conspiracy to commit healthcare fraud in Count One; and (2) Bradley Pierre, Andrew Prime, and Bogoraz with conspiracy to commit Travel Act bribery in Count Three.  (Id. ¶¶ 27-28, 32-34)  Bogoraz is not named in Count Two, which charges Bradley Pierre, Moy, and Weiner with conspiracy to commit money laundering by conducting financial transactions designed to disguise the "nature,

5

location, source, ownership, and control of the proceeds" of the healthcare fraud described in Count One.  (Id. ¶¶ 29-31)

## II.     SUPERSEDING INDICTMENTS, BOGORAZ'S OBJECTIONS TO THE (S3) INDICTMENT AND REQUESTS FOR AN ADJOURNMENT OF THE TRIAL

The Government obtained the twenty-one page (S2) Indictment on June 26, 2023. The superseding indictment repeats the factual allegations and charges found in the first indictment; adds Jean Pierre as a Defendant; contains additional factual allegations against Defendants other than Bogoraz; and adds a conspiracy to commit tax fraud count against Bradley Pierre, Jean Pierre, and William Weiner.  (S2 Indictment (Dkt. No. 191))

At an August 28, 2023 conference, this Court scheduled trial for January 16, 2024.  (Dkt. No. 217)  Bogoraz did not object to the January 16, 2024 trial date and consented to the exclusion of time until January 16, 2024, under the Speedy Trial Act.  (Aug. 28, 2023 Tr. (Dkt. No. 222) at 14)

On December 1, 2023, the Government notified the Court and the parties that it intended to seek a superseding indictment that would, inter alia, add a money laundering charge against Bogoraz.  (Govt. Dec. 1, 2023 Ltr. (Dkt. No. 275))  Quoting an October 10, 2023 letter to the Court, the Government noted that it "'ha[s] consistently advised [Aaron Rubin, Bogoraz's counsel,] since 2022 that when the parties proceed to trial, the Government might add additional charges against Bogoraz.'"  (Id. (quoting Govt. Oct. 10, 2023 Ltr. (Dkt. No. 243))  The Government further noted that the new indictment "will not result in any additional Rule 16 disclosures and therefore will not result in any delay of trial. . . ."  (Id.)

Despite the Government's explicit statement that it was not seeking a delay in the trial date, in a December 4, 2023 letter, Bogoraz's counsel – Aaron Rubin – asserted that the new indictment was "a dilatory tactic that is impermissibly motivated to upend Mr. Bogoraz's

Constitutional right to a speedy trial." (Dec. 4, 2023 Bogoraz Ltr. (Dkt. No. 276)) Rubin complained that "[t]he Government should not be permitted to rewrite its case just weeks before the trial date, nor should it be allowed to use the grand jury as an instrument of delay." (Id. at 2) Counsel asked the court to "(1) den[y] the Government's attempt to utilize the grand jury for the purpose of delaying the trial," and (2) to "permit the parties an opportunity to engage in a factual inquiry to revisit the reasons stated on the record for the exclusion of time under the Speedy Trial Act since at least August 28." (Id. at 2).

In a December 4, 2023 letter, the Government reiterated that the proposed (S3) Indictment would not result in any additional Rule 16 discovery and that the Government "will proceed to trial on January 16, 2024, meet all the Court's deadlines, and abide by its obligations under Section 3500, Brady, Giglio, and their progeny." (Govt. Dec. 4, 2023 Ltr. (Dkt. No. 277)) The Government further noted that all Speedy Trial Act exclusions had been on the basis of consent, a joint request, or the result of an automatic exclusion under the Speedy Trial Act in connection with Defendants' pretrial motions. (Id.)

In a December 4, 2023 reply, Bogoraz's counsel clarified that he was arguing that – in seeking the new indictment – the Government was attempting "to lure the defense to make the adjournment request." (Bogoraz Dec. 4, 2023 Reply Ltr. (Dkt. No. 280)) Rubin further asserted that "the Government was . . . not intending to proceed to trial in January," and was "instead seeking [a] delay. . . . to avoid impeachment disclosures relating to its primary cooperator, Anthony Rose." (Id.)

The Government obtained the (S3) Indictment on December 6, 2023. (S3 Indictment (Dkt. No. 282)) The (S3) Indictment, inter alia, adds a new money laundering conspiracy count against Bogoraz and Defendant Bradley Pierre, alleging that they conspired to

conduct financial transactions "designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of [bribery]." (Id. ¶ 9-10)[3]

In a December 7, 2023 letter, the Government reiterated that it was not seeking any delay in the trial, and explained as follows its decision to obtain a money laundering charge against Bogoraz:

> The Court is aware that the Government regularly returns to the grand jury once it has a clear sense of which defendants are going to trial. The Government has consistently advised [Bogoraz's counsel] since 2022 that when the parties proceed to trial, the Government might add additional charges against Bogoraz – specifically, a money laundering count. The Government then made a plea offer to Bogoraz on October 13, 2023 to the charged bribery conspiracy count. Bogoraz'[s] counsel notified the Government on October 30, 2023 that Bogoraz would not take the plea. The Government thereafter promptly sought a superseding indictment.
>
> There further is no prejudice to counsel from the additional money laundering charge. Counsel has been aware of the potential charge and related facts for over a year. Indeed, the Government reiterated by email to counsel in September 2023 that "we anticipate superseding Bogoraz into the money laundering count if we end up proceeding to trial," to which counsel responded, "Thank you for the heads up. I will continue to discuss with my client and reach out after receipt of the offer." The email exchange is incorporated herein as Exhibit A. The idea that the Government sandbagged counsel in hopes of improperly obtaining an adjournment is utterly baseless.

(Govt. Dec. 7, 2023 Ltr. (Dkt. No. 286) at 1) The Government also denied Bogoraz's assertion that it had superseded in order to "avoid impeachment disclosures relating to [Anthony Rose]," stating that it had "no idea what counsel is talking about." (Id. at 2)

On December 12, 2023, the Court conducted a conference to discuss the allegations in Bogoraz's letters and his request for an adjournment. Bogoraz's counsel argued

---

[3] The S3 Indictment is not a speaking indictment, and does little more than recount the necessary statutory language. See (S3) Indictment (Dkt. No. 282). The Government has represented, however, that it will seek to prove at trial the detailed factual allegations set forth in the Indictment and in the (S2) Indictment. (Dec. 12, 2023 Tr. (Dkt. No. 322) at 15)

that the exclusion of time under the Speedy Trial Act was void, because Bogoraz had not understood that the Government might seek a superseding indictment during the excluded time period. (Dec. 12, 2023 Tr. (Dkt. No. 322) at 3-4)

Noting that the exclusion of time through January 16, 2024 had been on consent, this Court asked Rubin whether it was true that the Government had told him "a long time ago that they were thinking about bringing a money laundering charge against [Bogoraz]." (Id. at 4) Rubin stated that the Government had "mentioned that probably since the beginning of the case." (Id.) Bogoraz's counsel likewise did not dispute that the prosecutors had told him that they were "planning on bringing a money laundering charge against [Bogoraz] if a trial in the case is going to be necessary." (Id. at 5) Bogoraz's counsel then stated that "the timing is what we object to." (Id.) The Court then asked "what problems . . . the timing present[s]," given the Government's assurance "that no additional discovery in the case is necessary." (Id.) Counsel responded that this fact merely showed that the Government should have added the charge earlier. (Id. at 5-6)

The Court then called Rubin's attention to the Government's September 11, 2023 email to him – three months earlier – in which it had stated that it intended to "supersed[e] Bogoraz into the money laundering count if we end up proceeding to trial." (Id. at 6 (citing Govt. Dec. 7, 2023 Ltr. (Dkt. No. 286), Ex. A)) Rubin confirmed that he took the Government at its word, but he continued to falsely argue – as he had in his letters – that "the government [is] asking for a delay of the trial." (Id. at 7; see also id. at 8, 10) Rubin also argued that he had learned that Anthony Rose – the Government's primary cooperator – was "a person of interest in a murder-for-hire case," and that the Government was attempting to provoke an adjournment to avoid disclosure issues regarding Rose. (Id. at 9-10)

9

Finally, Bogoraz's counsel argued that he could not prepare for a trial on the new money laundering count because "[a]ll it does is just track the language of the [statute]." (Id. at 10-11)

In response, the Government provided the basis for the new money laundering count against Bogoraz and co-defendant Bradley Pierre:

> Judge, we're happy to articulate on the record right now exactly what the [new] money laundering charge is. As defense counsel is aware, their client was originally charged with conspiracy to commit bribery. Mr. Bogoraz, while working for his wife's law firm, paid Anthony Rose to distribute bribes to various individuals, and your Honor is familiar with the rest of it.
> 
> Now, once Mr. Bogoraz received victims at his law firm, he signed them up, and he proceeded to pay kickbacks [to Rose], the proceeds of the bribery scheme. In order to hide the fact that those kickbacks were proceeds of bribery, he assisted Anthony Rose to open up two shell companies. The first one is called Qwikmed . . . . The second company is called NY Greater Records Retrieval.
> 
> Mr. Bogoraz and Mr. Rose told the banks that these two companies were for medical consulting, and the purpose of setting up these shell companies was to hide the fact that these kickbacks were the proceeds of bribery, and included within that Mr. Bogoraz wrote checks from his law firm to these companies. He recorded on the checks that these checks were for medical records, which of course was false. That's the very simple basis for the money laundering charge.
> 
> As you mentioned, defense counsel's been in possession of all the Rule 16 for this charge. We think defense counsel can take a look at the bank records already produced, and those have all the relevant checks, as well as the incorporation documents, and what was reported to the banks as to the purpose of the companies.
> 
> . . . .
> 
> We provided Mr. Bogoraz a basis of the money laundering charge. We told him about it for some time.
> 
> And I'd like to note that when we notified Mr. Rubin again that we were planning to bring the money laundering charge in September, it was not this great outburst of rage and histrionics. It was actually a very calm email response saying, "thanks for the heads up. I'll consult with my client."
> 
> I understand Mr. Rubin is describing this as a drastic change to the indictment, but, in fact, it's not. All the facts of the money laundering charge are the same

10

> types of facts that we would be proving up with regard to the bribery conspiracy charge. It just so happens these facts both support a bribery conspiracy and a money laundering charge.

(Id. at 11-13)

Concluding that counsel had known about the possibility of a money laundering charge against Bogoraz for nearly two years; had been in possession of the relevant evidence for more than a year; and was fully informed as to the factual basis for that charge, this Court denied Bogoraz's request for an adjournment of the trial date. (Id. at 13-14)

On December 24, 2023, Bogoraz moved the Court to reconsider its denial of his motion to adjourn the trial date. (Dkt. No. 310) The Government filed its opposition to that request on December 28, 2023. (Dkt. No. 316)

## DISCUSSION

Bogoraz moves to adjourn the trial date currently scheduled for January 17, 2024.[4] (Dkt. No. 310) He also requests relief pursuant to Brady and Giglio in connection with certain impeachment material related to Anthony Rose, a cooperating witness. (Bogoraz Br. (Dkt. No. 312) at 18-20) The Government opposes both requests. (Dkt. No. 316)

## I. MOTION FOR AN ADJOURNMENT

Bogoraz contends that he is entitled to an adjournment of the trial date because he was "only apprised of the new money laundering charge for the first time a month before trial." (Bogoraz Br. (Dkt. No. 312) at 6) In reality, Bogoraz was told nearly two years ago that he

---

[4] The Court informed the parties at the December 12, 2023 conference that the trial date of January 16, 2024 would be adjourned one day to January 17, 2024 to accommodate jury selection in a high profile case scheduled to begin on January 16, 2024. (Dec. 12, 2023 Tr. (Dkt. No. 322) at 32)

11

would be charged with money laundering if he elected to proceed to trial. (Dec. 12, 2023 Tr. (Dkt. No. 322) at 4)

The Government "has consistently advised [Bogoraz's lawyer] since 2022 that when the parties proceed to trial, the Government might add additional charges against Bogoraz—specifically, a money laundering count." (Govt. Dec. 7, 2023 Ltr. (Dkt. No. 286) at 1) And in a September 11, 2023 email – more than four months before trial – the Government reminded Bogoraz's lawyer that it intended to seek a superseding indictment charging Bogoraz with money laundering in the event that he rejected the Government's plea offer and elected to proceed to trial. (See id. Ex. A)

In response to the Government's September 11, 2023 reminder, Bogoraz's lawyer replied, "[t]hank you for the heads up"; he did not express any surprise nor did he seek any explanation of the factual basis for the money laundering charge. (Id.) Counsel's reaction to the warning about an upcoming money laundering charge supports the Government's representation that it has "always told Bogoraz's counsel that the money laundering charge arises from the fact that Bogoraz concealed payments to [Anthony] Rose of illegal bribe proceeds." (Govt. Opp. (Dkt. No. 316) at 7)

As discussed above, the original indictment in this case – which was filed in January 2022, nearly two years ago – was a speaking indictment that laid out in great detail the nature of the alleged no-fault insurance fraud scheme and Bogoraz's role in that scheme. (Dkt. No. 1) While that indictment and the (S2) Indictment do not name Bogoraz in the money laundering conspiracy count brought against co-defendants Bradley Pierre, Marvin Moy, and William Weiner (id. ¶ 29-31), they explicitly allege that "BOGORAZ and [BRADLEY] PIERRE agreed to jointly pay bribes for patient and client referrals to the No-Fault Facilities and Law

12

Firm-1. . . ." (Id. ¶ 9)  These indictments also make clear that Bradley Pierre and Bogoraz jointly agreed to make bribe payments to "Runners" – people such as Anthony Rose – who bribed 911 operators and hospital employees to disclose the confidential information of motor vehicle accident victims:

> 23. The No-Fault Scheme depended on the No-Fault Facilities receiving a steady supply of motor vehicle accident victims.
>
> 24. As part of the scheme, BRADLEY PIERRE and ARTHUR BOGORAZ, the defendants, arranged for the Runners, including ANDREW PRIME, the defendant, to bribe employees or agents of public and private institutions, including hospitals and the NYPD, to unlawfully disclose the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere.
>
> 25. After obtaining the confidential information of motor vehicle accident victims, the Runners contacted the victims and made false representations in order to steer victims to receive medical treatment from the No-Fault Facilities, and legal representation from Law Firm-1 and Law Firm-2.
>
> 26. BRADLEY PIERRE, the defendant, paid the Runners approximately $1,500 to $3,000 per successful "referral" to a No-Fault Clinic, $700 to $1,500 per successful "referral to Law Firm-2, and $150 per successful "referral to Nexray. ARTHUR BOGORAZ, the defendant, likewise paid the Runners $700 to $1,500 per successful referral to Law Firm-1.  The Runners then took a portion of the kickbacks for themselves and funneled the rest of the money to the lead sources that provided the confidential information.

(Id. ¶¶ 23-26) (emphasis in original)

On December 6, 2023, the Government did exactly what it had been telling Bogoraz for months than it planned to do – namely, obtain a superseding indictment that added a money laundering charge against Bogoraz.  (S3 Indictment (Dkt. No. 282) ¶¶ 9-10)  The new charge alleges that between 2016 and 2019, Bogoraz and Bradley Pierre conspired to engage in financial transactions aimed at concealing the proceeds of bribery.  (Id.)  As discussed above, the Government laid out the factual basis for that charge in earlier conversations with Bogoraz's counsel as well as at the December 12, 2023 conference.

13

In sum – and as alleged in earlier indictments – the Government contends that Bogoraz and Bradley Pierre "jointly agreed" to pay kickbacks to "Runners" such as Anthony Rose, who referred clients to Pierre's clinics and Bogoraz's wife's law firm. What is new in the (S3) Indictment's money laundering charge is the allegation that Bradley Pierre and Bogoraz further agreed to disguise the bribe payments they paid to Anthony Rose:

> Judge, we're happy to articulate on the record right now exactly what the money laundering charge is. As defense counsel is aware, their client was originally charged with conspiracy to commit bribery. Mr. Bogoraz, while working for his wife's law firm, paid Anthony Rose to distribute bribes to various individuals, and your Honor is familiar with the rest of it.
>
> Now, once Mr. Bogoraz received victims at his law firm, he signed them up, and he proceeded to pay kickbacks, the proceeds of the bribery scheme. In order to hide the fact that those kickbacks were proceeds of bribery, he assisted Anthony Rose to open up two shell companies. The first one is called Qwikmed. That's spelled Q-w-i-k-m-e-d. The second company is called NY Greater Records Retrieval.
>
> Mr. Bogoraz and Mr. Rose told the banks that these two companies were for medical consulting, and the purpose of setting up these shell companies was to hide the fact that these kickbacks were the proceeds of bribery, and included within that Mr. Bogoraz wrote checks from his law firm to these He recorded on the checks that these checks were for medical records, which of course was false. That's the very simple basis for the money laundering charge.

(Dec. 12, 2023 Tr. (Dkt. No. 322) at 4)

The Government provided additional detail about the disguised bribe payments to Anthony Rose in a December 17, 2023 email to Bogoraz's counsel:

> Bogoraz (vis-à-vis Bogoraz Law Group and Instant Capital Partners) is the payor. The payees are primarily Qwik Med and Greater NY Records Retrieval. Weitz Marketing received small payments as well. The unlawful activity is bribe proceeds (as specified in the indictment).

(Rubin Decl., Ex. E (Dkt. No. 311-5) at 2)

As described by the Government, the new money laundering charge involves the same bribery activity – and thus the same evidence – that forms the basis of the Travel Act

14

conspiracy charge that Bogoraz has faced for nearly two years. (Indictment (Dkt. No. 1) ¶¶ 9, 24, 26, 32-25) Accordingly, the net effect of the new money laundering charge in the (S3) Indictment is that – in addition to being charged with conspiring to pay bribes – Bogoraz is now charged with conspiring to disguise the proceeds of those bribes by, among other things, routing payments though shell companies.

The Rule 16 discovery relevant to the new money laundering charge was provided to Bogoraz nearly a year and a half ago. (July 18, 2022 Conf. Tr. (Dkt. No. 99) at 4-5) At the same time, the Government took the highly unusual step of disclosing to Bogoraz and his co-defendants the Section 3500 material of "35 to 40 witnesses" expected to testify at trial. (Id. at 5) Accordingly, since July 2022, Bogoraz has been in possession of not only the Rule 16 discovery relevant to the new money laundering charge but also the Section 3500 material of many of the witnesses expected to testify against him.

As discussed above, the Government has also explained in detail to Bogoraz's lawyer the factual basis for the new money laundering charge against Bogoraz, including what proceeds of specified unlawful activity were laundered (the proceeds of bribes paid by Anthony Rose and financed by Bogoraz and Bradley Pierre); the entities that made the disguised payments (Bogoraz Law Group and Instant Capital Partners); the shell companies that received the laundered payments (Qwik Med, Greater NY Records Retrieval, and Weitz Marketing); and the true beneficiary of the laundered payments (Anthony Rose). Included in discovery provided on November 16, 2023 are the bank records for the alleged shell companies that were recipients of

15

the alleged laundered payments – Qwik Med, Greater NY Records Retrieval, and Weitz Marketing. (Govt. Opp. (Dkt. No. 316) at 7)[5]

Bogoraz's counsel complains, however, that he did not receive access to the Government's November 16, 2023 production until December 29, 2023, and that he needs additional time to review this discovery in advance of trial. (Def. Reply (Dkt. No. 318) at 4) But Rubin acknowledges that he "received an email from a Government paralegal" on November 16, 2023 "notifying [him] that discovery was being made available . . . and providing a link to that discovery." (Rubin Reply Decl. (Dkt. No. 319) ¶ 3) Rubin concedes that he "possibly overlooked" following up with the Government about accessing the production until December 28, 2023. (Id. ¶ 7)

Bogoraz also claims that he needs additional records related to the alleged money laundering entities – records that are not in the Government's possession – and that absent these records he will not be able to "properly investigat[e] . . . the nature of the transactions and the identity of witnesses (other law firms) that paid into those accounts." (Bogoraz Br. (Dkt. No. 312) at 15-17) But Bogoraz has been on notice for nearly two years that he would face a money laundering charge, and has had ample time to conduct whatever investigation he deemed necessary concerning that potential charge.

Finally, Bogoraz claims that he needs an adjournment in order "to investigate potentially critical areas of impeachment of the central cooperator, Anthony Rose, for which the Government has indicated it will be unable, or unwilling, to provide information, and for which has only become apparent a few weeks ago." (Bogoraz Br. (Dkt. No. 312) at 17) In particular,

---

[5] The Government produced the remainder of certain "missing check images" on December 28, 2023. (Id. at 7 n.1)

16

Bogoraz claims that he recently "received information from a private investigator that was informed by an NYPD Detective in the 61st Precinct that Anthony Rose is a person of interest in a shooting that took place while he has been out on bail, on or around February 2022 in Brooklyn." (Id.; see Rubin Decl., Ex. G (Dkt. No. 311-7) at 2)

It has been known to Defendants since the pendency of United States v. Rose, No. 19 Cr. 789, however, that Anthony Rose is a cooperating witness for purposes of his own case, as well as the related case of United States v. Gulkarov, No. 22 Cr. 20 and United States v. Pierre, No. 22 Cr. 19. Bogoraz has thus had nearly two years to investigate potential impeachment material related to Rose.

In sum, Bogoraz has presented no basis for adjourning the trial date in this case, which was set in August 2023. Accordingly, the motion for reconsideration and the renewed request for an adjournment of the trial date will be denied.

## II.     REQUEST FOR RELIEF PURUSANT TO *BRADY AND GIGLIO*

Bogoraz contends that the Government has an obligation pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), to furnish materials related to the alleged murder-for- hire incident involving Anthony Rose. (Bogoraz Br. (Dkt. No. 312) at 18)

As to Brady, it is not clear how evidence of Rose's involvement in a murder would be exculpatory of Bogoraz in the instant case. Such evidence could, of course, go to Rose's credibility for purposes of Giglio. As a general matter, "[i]nformation coming within the scope of th[e] [Brady] principle . . . includes not only evidence that is exculpatory . . . but also evidence that is useful for impeachment, i.e., having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (citing Giglio, 405 U.S. at 154-55). "Giglio material falls under the umbrella

17

of the Brady rule because impeachment material directly affects the credibility of a witness and the 'reliability of a given witness may well be determinative of guilt or innocence.'" United States v. Frank, 11 F. Supp. 2d 322, 325 (S.D.N.Y. 1998) (quoting Giglio, 405 U.S. at 154).

However, the Government's disclosure "'obligation [under Brady and Giglio] extends only to material evidence . . . that is known to the prosecutor.'" United States v. Hunter, 32 F.4th 22, 35 (2d Cir. 2022) (quoting Avellino, 136 F.3d at 255). "[K]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" Avellino, 136 F.3d at 255 (quoting United States v. Gambino, 835 F. Supp. 74, 95 (E.D.N.Y. 1993)).

Here, the Government informed Bogoraz's lawyer in a December 17, 2023 email that it is "not in possession" of any materials related to the alleged murder-for-hire incident, and that the NYPD officers in Brooklyn conducting the investigation of this incident are not part of the "prosecution team." (Rubin Decl., Ex. E (Dkt. No. 311-5) at 3; see also Govt. Opp. (Dkt. No. 316) at 9)

Bogoraz asks this Court to rule, however, that the Brooklyn NYPD officers conducting the murder-for-hire investigation are part of the "prosecution team" in the instant case. (Bogoraz Br. (Dkt. No. 312) at 18) To prevail on such an argument, Bogoraz must offer evidence that these NYPD officers have acted as an "arm of the prosecutor" in the instant case. United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975). "Courts in this District apply [a] 'joint investigation' analysis in assessing [prosecutors'] obligations with respect to Brady and

18

Giglio material held by [other government agencies]." United States v. Martoma, 990 F. Supp. 2d 458, 460 (S.D.N.Y. 2014). In United States v. Middendorf, 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018), the court sets forth the legal standards governing the determination as to whether federal prosecutors have engaged in a "joint investigation":

> The prosecution's obligation to disclose Brady material extends to any material in the possession of any entity that has acted as an "arm of the prosecutor" in a given case. United States v. Blaszczak, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018) (quoting United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975)). In other words, where the prosecution "conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for Brady evidence." United States v. Gupta, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012). A number of factors are relevant in determining whether the prosecution conducted a "joint investigation," including whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings. See Blaszczak, 308 F. Supp. 3d at 741-42; see also United States v. Martoma, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014) (relying on the joint conduct of interviews, exchange of documents, coordination of deposition efforts, and communications regarding the status of fact-gathering to find a joint investigation).

Middendorf, 2018 WL 3956494, at *4.

Here, Bogoraz has not met this standard. He merely asserts – without explanation – that "the NYPD played an integral part in the investigation." (Bogoraz Br. (Dkt. No. 312) at 18) He also cites a press release in which the then-Commissioner of the NYPD thanks the United States Attorney's Office and the NYPD in connection with Rose's arrest, following the indictment in United States v. Rose. (Id. at 19) While the Government acknowledges that "one detective in the NYPD assisted the Government's prosecution of Anthony Rose in 2019," there is no evidence – and the Government denies – that any NYPD officer investigating the alleged murder-for-hire incident in Brooklyn was involved in the instant no-fault insurance fraud

prosecution. (Govt. Opp. (Dkt. No. 316) at 8) Given these circumstances, Bogoraz's request for relief under Brady and Giglio will be denied.

## CONCLUSION

For the reasons stated above, Defendant Bogoraz's motion for an adjournment of the trial date and for relief under Brady and Giglio is denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 310).

Dated: New York, New York
       January 3, 2024

                                              SO ORDERED.

                                              _____
                                              Paul G. Gardephe
                                              United States District Judge